Filed 3/29/23  P. v. Vindiola CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                v.<br><br>XAVIER ANGELO VINDIOLA,<br><br>        Defendant and Appellant. | F083433<br><br>(Super. Ct. No. F20904699)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Kari Mueller, Lewis A. Martinez, and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Xavier Angelo Vindiola of:  (1) willful infliction of corporal injury on a cohabitant with a prior domestic violence conviction within seven

years (Pen. Code,[1] § 273.5, subd. (f)(1); count 1); (2) assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4); count 2); (3) false imprisonment by violence (§ 236; count 3); (4) criminal threats (§ 422; count 4); (5) dissuading a witness (§ 136.1, subd. (b)(2); count 5);[2] and (6) three misdemeanor contempts of court based on restraining order violations (§ 166, subd. (c)(1); counts 7, 8 & 9).[3]  As to counts 1 and 2, the jury found it true that Vindiola personally inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)).  Lastly, the jury also found it true that Vindiola had a prior serious felony conviction (§ 667, subd. (a)), and six prior strikes (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

The trial court sentenced Vindiola to an aggregate term of 63 years to life, comprising a determinate term of 13 years to be followed by two consecutive indeterminate terms of 25 years to life under the Three Strikes Law.  The indeterminate terms were imposed on the section 273.5 conviction in count 1 and the 136.1(b)(2) conviction in count 5.[4]  The court also revoked Vindiola's probation arising out of his

---

[1] All undesignated statutory references are to the Penal Code.

[2] For purposes of clarity in our discussion, all subsequent references to section 136.1 and its varieties will omit "section", "subdivision," and "subd."; e.g., simply 136.1(b)(2).

[3] The jury was unable to reach a verdict on a second 136.1(b)(2) witness dissuading charge (count 6), and it was eventually dismissed.

[4] The trial court originally sentenced Vindiola to a 90-year sentence — a *15*-year determinate sentence, to be followed by *three* consecutive 25-to-life indeterminate sentences.  However, the court later recalled the sentence and told the parties it was "very seriously considering striking multiple strikes to where there'd be one strike left, and … the Court would sentence accordingly."  Referring to its original sentence, the court stated, "I think that's a little bit harsh."  At a new sentencing hearing, the court reconsidered Vindiola's earlier "motion" to strike strikes, and in the end imposed the current 63-year sentence — *13* years determinate plus *two* 25-to-life indeterminate terms.

2019 conviction in Fresno County Superior Court Case number F19901922 (the probation case) and imposed a concurrent 15-year determinate sentence.[5]

Vindiola appeals, claiming:

(1)  His dissuading a witness conviction in count 5 must be reversed because the underlying acts of dissuasion occurred after the original felony complaint had already been filed.

(2)  The witness dissuasion conviction must also be reversed because the trial court prejudicially misinstructed the jury:  (a) on the temporal limitations of the offense as set forth in issue (1); and (b) by failing to tell the jury the offense required that a defendant attempt to prevent or discourage a victim/witness from causing charges to be filed, not just from assisting in the prosecution of those charges.

(3)  Remand for resentencing is required because of retroactive changes made to section 1170 after Vindiola's original sentence was imposed.

(4)  The trial court imposed an unlawful sentence in the probation case.

(5)  The trial court abused its discretion by failing to strike enough of his prior strikes to permit an aggregate determinate sentence.

(6)  The abstract of judgment must be corrected to include his presentence custody credits.

The People respond by arguing that 136.1(b)(2) encompasses Vindiola's conduct in this case, there was no instructional error, and the trial court did not abuse its discretion

---

[5] Vindiola's convictions in the probation case were the basis for the prior serious felony conviction and the six strikes found true in the current case.  They consisted of one count of corporal injury to a cohabitant (§ 273.5, subd. (a)) with a firearm (§ 12022.5), and five counts of dissuading a witness (two counts of 136.1(a)(2) and three counts of 136.1(b)(2)).

The victim in all six prior offenses (L.L.) was the same as in the current case.  After serving a one-year county jail sentence on the 2019 case, Vindiola was released from custody and within four months committed the offenses in the current case.

by not striking at least five of Vindiola's six strikes. They agree that remand for resentencing is necessary because of the changes made to section 1170, that the 15-year sentence imposed on the probation case was unauthorized, and that the abstract of judgment is deficient because it failed to include Vindiola's presentence custody credits.

We find the jury was misinstructed on the witness dissuasion charge in count 5 and the instructional errors were not harmless. The conviction for that offense must therefore be reversed and its indeterminate sentence vacated.

As for the alleged sentencing errors, we agree that Vindiola's determinate sentence must also be reversed, and the matter remanded for resentencing under the current version of section 1170. Similarly, the sentence imposed in the probation violation case was unlawful and must also be modified at resentencing.

Because the judgment is being partially reversed and the matter remanded for resentencing, we need not resolve whether the trial court abused its discretion by not striking any of Vindiola's six prior strikes. Vindiola may re-raise the issue of striking strikes at his new sentencing hearing. Finally, following the ultimate resentencing, the amended abstracts of judgment in both the current case and the probation case must include Vindiola's presentence custody credits.

The judgment is therefore reversed in part, affirmed in part, and remanded for further proceedings.

## **FACTS**

Because the basic facts are not in dispute, we need not lay them out in great detail. Nevertheless, we do so as we must in the light most favorable to the judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Additional facts specific to the discussion of the issues raised are found below.

Vindiola and L.L. had a fractious and oftentimes violent domestic relationship, but they also had a child together. In 2019, Vindiola assaulted L.L. with a firearm, which resulted in a section 273.5, subdivision (a), conviction with a section 12022.5,

4.

subdivision (a) enhancement. On June 27, 2019, he was convicted of five counts of violating 136.1 for his repeated attempts to dissuade L.L. from cooperating with police, assisting in the prosecution of his felonious assault on her, and testifying against him.[6] The court imposed a nine-year prison sentence but stayed its execution and instead placed Vindiola on a grant of probation. The court also issued a criminal protective order, ordering Vindiola to have no contact with L.L. Nonetheless, when Vindiola was released from county jail in April 2020, the pair continued their on-again, off-again relationship.

On July 19, 2020,[7] L.L., along with their baby girl, drove to the apartment where Vindiola was living at the time, and the two got into an argument. It escalated and Vindiola began punching L.L. with his fist and even whipped her with an extension cord. He forced her back into her car, and they drove off, leaving the baby behind. Inside the car, Vindiola continued to punch and choke L.L. He kept the car doors locked, held on to L.L. by her hair, and told her he was going to kill her.

While they were in the car, Vindiola called his cousin B.M., asking her to come to the apartment and pick up the baby; B.M had often taken care of the child. When B.M. arrived, no one was there so she called Vindiola, asking where the baby was; he told her she was inside the apartment. B.M. said she needed the baby's car seat. Vindiola drove back to the apartment, took the car seat out of L.L.'s car, and put it in B.M.'s car. While Vindiola was buckling the car seat into B.M.'s car, L.L. rolled her car window down, stuck her head out, and screamed: "[B.M.], please help me, please help me. If you don't help me, he's going to kill me…."

Vindiola ran back to L.L.'s car. He stuck his hand through the partially open window, grabbed L.L. by her hair, and began punching her in the head. B.M. ran after

---

[6] The section 273.5, subdivision (a), conviction with the gun-use enhancement and the five 136.1 convictions are all strikes under the Three Strikes Law. (See §§ 667, subd. (d), 667.5, subd. (c)(8), 1192.7, subd. (c)(8) & (c)(37).)

[7] Subsequent references to dates are to dates in 2020 unless otherwise stated.

Vindiola and punched him, which allowed L.L. to open the door, get out of the car, and run. Vindiola got back into L.L.'s car and started to drive after her, but L.L. "darted across the street and jumped in [B.M.'s] car." Vindiola got out of L.L.'s car and went to B.M.'s car. He reached in, again grabbed L.L. by her hair, pulled her out, and dragged her by her hair back to her car. While she was being dragged along the ground, he repeatedly punched her in the head. According to B.M., the second punch knocked L.L. out because "her whole body went limp." B.M. added, "[A]bout the fourth or fifth punch … all I could hear was [L.L.'s] head hitting the concrete like a melon."

Meanwhile, neighbors had called 911. B.M. said police showed up around the fourth or fifth punch. When they arrived, Vindiola ran. Officers gave chase and eventually found and arrested Vindiola.

The officers spoke with L.L., who identified Vindiola as her assailant. They saw that L.L.'s face was swollen. B.M. said she noticed L.L.had urinated on herself, and "[h]er whole shirt was covered in blood." At the hospital, doctors determined L.L. had a fractured jawbone, and "a lot" of soft tissue swelling.

The district attorney filed a felony complaint on July 21, and Vindiola was arraigned on that complaint on July 22. At arraignment, a court issued another criminal protective order, once again ordering Vindiola to have no contact with L.L. Despite the two protective orders, Vindiola made numerous jail phone calls to L.L; the first was made on the morning after the assault, even before the original felony complaint had been filed.

A preliminary hearing on the complaint was scheduled for August 28. In a call made in the afternoon of August 27, L.L. told Vindiola that while she was staying at her sister's house, a person knocked on the door. She opened the door slightly and after the person identified herself and asked for L.L., L.L. said something to the effect, "that's my

6.

sister [who] just moved," and closed the door.  The person continued to knock on the door, and eventually "left a paper … at the door."**8**

L.L. told Vindiola that the "paper" was "[f]or tomorrow."  Vindiola responded:  "I tell you watch out who you answer the door to and you didn't give a fuck….  I told you be careful [], be careful don't – don't answer no nothing and nothing [].  …  I fucking told you [] watch even regardless – watch who you – who's at the door."

Vindiola further explained the importance of avoiding the subpoena:  "[T]he last time they gave the victim a paper … when he didn't show up last time, they're going to do a body attachment, it's like — a body attachment is when they um — if they see you — if they see him then they gonna take him in."  L.L. replied, "I know, I know."  He asked her:  "So, what are you going to do?  So, how you going to do this? …  Explain to me how the fuck you are going to do this []."  L.L. answered she would "[j]ust be fucking inside….  So … anyway … just fucking sit there or not be home at all…."  He emphasized to her that "today's not the party … [t]omorrow's the party, they're going to come way earlier than that before, they do it all the time," presumably referring to the preliminary hearing.

Perhaps remembering his five prior convictions for witness dissuasion, the conversation continued as follows:

"[Vindiola]:  What are you gonna do … cause obviously you know what a speedy trial is?  They have a certain number of days and time…. You can't do that.

"[L.L.]:  Do what?

"[Vindiola]:  It's not even that long.

"[L.L.]:  Do what?

"[Vindiola]:  Nothing….

---

**8** At trial, L.L. admitted that the "paper" was a subpoena.

"[L.L.]: What? Me? Go where? Go where? Tell me where then. Tell me where to go…. [¶] … [¶]

"[Vindiola]: You should fucking know better….

"[L.L.]: Huh?

"[Vindiola]: You should know better already….

"[L.L.]: You know what —

"[Vindiola]: You should know I can't say anything on the phone….

"[L.L.]: I love this. Okay well then, what do you expect me to do? You going to send me a message or something fucking later or what? … [¶] … [¶]

"[Vindiola]: You should know better already….

"[L.L.]: What do you mean? I can't read your mind.

"[Vindiola]: You should know what to do."

After arguing about the practicality of her staying home all day or leaving early in the morning and staying out until late at night, they talked about the possibility of her staying at other places, including a hotel. Finally, Vindiola said to L.L.: "[B]ut if you do, do this for me [], what the fuck you stay — just stay outside [] — all you gotta do is stay out of the motherfucking way and then boom []. Without the dude — without the dude there's nothing they can do. That's what I tried to tell you." L.L. replied, "I know. [¶] Yeah, alright." Vindiola pressed her further, "So, what — what you going to do []?" She answered, "I told you what imma do, be sitting up in a fucking hotel and shit, or going out of fucking town…."

In a second call later that same day, they again discussed where L.L. should go to avoid her subpoena, "to find like places to fuckin' go to pass the time." L.L. mentioned the possibility of having "[her] friend Alex pick [her] up [at her] house…." Vindiola

8.

instructed L.L. to tell Alex, if Alex is staying at the house and "the party people come,"[9] to say that L.L. "went out of state."

On August 28, the preliminary hearing was continued and was not held until February 2021. L.L. did not appear on August 28 and a $5,000 body attachment order for her was issued.

Several days later, in a September 4 call, Vindiola told L.L. that B.M. had "talked to the DA," and that B.M. was "gonna come testify…." He told L.L., "[Y]ou can call [B.M.] and have a talk with her and tell her like 'what the fuck are you doing?' …." L.L. said B.M. would not listen to her and would tell her to worry about herself and the baby, not Vindiola. Vindiola responded: "Dude … who cares [] you['re] my baby mama you should at least tell her 'what the fuck are you doing like?' You['re] trying to take him away from his daughter or what? Because he's already looking at life a[s] it is … you're just putting more weight on his shoulders." When L.L. insisted she "already kn[e]w what [B.M.'s] gonna tell [her]," Vindiola said, "Can't even help me out with that." Eventually, he said, "[A]t least try to give [B.M.] a call and listen like 'what the fuck? like you know what I mean … I don't mean any disrespect, but don't you understand he's already like a life sentence [] you know what I  mean?' " L.L. asked, "So, what do you want … what do you want me to tell her … for you because I don't wanna … those aren't my words … I don't want to say what the fuck[.]" Vindiola replied, "Never mind."

One protective order violation count was based on the August 27 calls, one count for the September 4 call, and the third was for having contact with L.L. on the date of the July 19 offenses.

L.L. did not appear at the February 2021 preliminary hearing, and the body attachment order remained in effect. On April 19, 2021, after the information had been

---

[9] At trial, L.L. claimed not to know what Vindiola's reference to "party people" meant. The prosecutor argued "[p]arty people" was code for the District Attorney's Office and the "party" was the "court process."

filed, another body attachment order for L.L. was issued. On May 5, 2021, after the trial had already begun and the trial court was pre-instructing the jury, the prosecutor noticed that L.L. had come into the courtroom. She was taken out in the hallway, where she refused to talk to district attorney investigators. After a brief recess, the attachment order for L.L. was recalled, and she finally took the witness stand for the first time.

## DISCUSSION

### I. The Jury Instruction on the Witness Dissuasion Charges:

Vindiola contends his 136.1(b)(2) conviction in count 5 must be reversed because the trial court misinstructed the jury on the elements of the offense. He makes two related arguments: (1) the court failed to properly instruct the jury on the *timing* of the dissuasion — the same issue he raised in his initial substantive claim;[10] and (2) the court also failed to instruct the jury they were required to find that Vindiola intended both to dissuade L.L. from cooperating with the prosecution *and* from causing charges to be filed.

---

[10] Regarding Vindiola's substantive claim, there is a current split of authority as to whether 136.1(b)(2) applies to post-charging conduct or not. Our Supreme Court has granted review to decide whether [136.1(b)(2)], which prohibits dissuading or attempting to dissuade a victim or witness from causing a charging document to be sought and prosecuted, and assisting in the prosecution thereof, encompass attempts to dissuade a victim or witness after a charging document has been filed? (*People v. Reynoza* (2022) 75 Cal.App.5th 181, review granted May 11, 2022, S273797) (*Reynoza*). Both parties have concentrated their briefing on this issue.

Vindiola relies on the case in which the Supreme Court granted review, *Reynoza, supra,* 75 Cal.App.5th 181, where the Sixth District held it did not apply in a case where a *misdemeanor* complaint had been filed before the dissuasion occurred but not, like here, where a felony complaint had been filed but not the information. He also relies on *People v. Fernandez* (2003) 106 Cal.App.4th 943 (*Fernandez*), although that case involved a conviction under 136.1(b)(1), not (b)(2). The People rely on *People v. Velazquez* (2011) 201 Cal.App.4th 219 (*Velazquez*), where Division Four of the Second District held 136.1(b)(2) did apply to post-complaint conduct in an underlying *felony* case. The misdemeanor/felony distinction has not yet been discussed in any published case we have found.

10.

With a two-page response, the People summarily dismiss Vindiola's instructional error claims, referring instead to their substantive briefing on the timing issue now pending before the Supreme Court in *Reynoza*. As to the second instructional error claim, they simply refer to their related briefing on the meaning of the term "and" in 136.1(b)(2)'s statutory description of the underlying offense.

In their zeal to deal with the statutory interpretation issues arising from Vindiola's *Reynoza* claims, neither party appears to have recognized the more mundane – and dispositive – instructional errors that were made here regarding the 136.1(b)(2) charge. Furthermore, because these errors independently require that we reverse Vindiola's 136.1(b)(2) conviction, we need not succumb to the parties' implicit invitation for an advisory opinion on the *Reynoza* dispute or to parse the intricacies of the conjunctive term "and" as it appears in 136.1(b)(2); our Supreme Court will resolve those issues for us.

Simply put, although Vindiola is correct that instructional error requires we reverse his conviction for violating 136.1(b)(2), it is not for the reasons he asserts.[11] Even so, the result is the same.

**A. Introduction**

Depending upon the nature of the conduct and a defendant's mens rea, each form of prohibited victim or witness dissuasion in 136.1 has its own distinct elements. (See, e.g., *Velazquez, supra,* 201 Cal.App.4th at pp. 232–233 [upholding 136.1(b)(2) conviction for threats to persuade a witness to *drop charges* and distinguishing witness intimidation under 136.1(b)(1), which criminalizes pre-arrest attempts to dissuade a

---

[11] Although Vindiola did not object to the trial court's instruction on this charge, he has not forfeited the issue on appeal because, as we discuss below, here the error affected his substantial rights. (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [a defendant's failure to object to a jury instruction does not result in forfeiture on appeal when the instruction contains an incorrect statement of the law]; see § 1259.)

victim from *reporting* a crime]; *Fernandez, supra,* 106 Cal.App.4th at p. 949 [reversing conviction under 136.1(b)(1), for dissuading a victim from *reporting* a crime, where defendant's conduct in threatening witness's *testimony* instead violated § 137, subd. (c), but not 136.1(b)(1)]; *People v. Hallock* (1989) 208 Cal.App.3d 595, 607 (*Hallock*) [reversing 136.1(b)(1) conviction for attempting to dissuade a victim from *reporting* a crime where the jury was wrongly instructed on an uncharged violation of 136.1(a) for dissuading a victim from attending or *testifying* at trial]; cf. *People v. Torres* (2011) 198 Cal.App.4th 1131, 1137–1138 ["[136.1] defines a family of 20 related offenses," including five underlying crimes punishable as misdemeanors or as felonies under four sets of circumstances].)

For purposes of our discussion, the relevant portions of 136.1 read as follows: "(a) … [A]ny person who does any of the following is guilty of a public offense … : [¶] (1) Knowingly and *maliciously* prevents or dissuades any witness or victim from *attending or giving testimony* at any trial, proceeding, or inquiry authorized by law. [¶] (2) Knowingly and maliciously *attempts* to prevent or dissuade any witness or victim from attending or giving testimony at any trial, proceeding, or inquiry authorized by law. [¶] . . . [¶] (b) … [E]very person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense … : [¶] (1) *Making any report* of that victimization to any peace officer or state or local law enforcement officer or probation or parole or correctional officer or prosecuting agency or to any judge. [¶] (2) *Causing* a complaint, indictment, information, probation or parole violation to be sought and prosecuted, *and assisting* in the prosecution thereof.…"[12]  (§ 136.1, italics added.)

_____

[12] Subdivision (c) goes on to define a set of more aggravated offenses: 136.1(c)(1) punishes persons who knowingly and maliciously commit a 136.1 offense by force or by an express or implied threat of force or violence; 136.1(c)(2) applies to conspiracies; and 136.1(c)(4) covers instances where the offense is committed for pecuniary gain.

As used in all applicable 136.1 prosecutions, the term " '[m]alice' means an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." (§ 136, subd. (1).)

Thus, there are two fundamental differences between 136.1(a) and 136.1(b). First, the mens rea: the former requires *malice* while the latter does not. (*People v. Brackins* (2019) 37 Cal.App.5th 56, 66 (*Brackins*) ["a subdivision (b) offense has no malice element"]; accord *People v. Cook* (2021) 59 Cal.App.5th 586, 590 (*Cook*).) Second, both subsections of subdivision (a) refer to "*attending* or *giving testimony* at any trial, proceeding, or inquiry authorized by law," while the subsections of subdivision (b) refer to different conduct, including dissuading the *reporting* of "victimization" to the authorities in 136.1(b)(1) or, as was charged here, *causing* criminal proceedings "to be sought and prosecuted" and "*assisting* in the prosecution thereof" in 136.1(b)(2). (Italics added.)

## B. Additional Factual Background

For the 136.1(b)(2) witness dissuasions charged in counts 5 and 6,[13] the trial court instructed the jury with its modified version of CALCRIM No. 2622:

"To prove that the defendant is guilty of [violating 136.1(b)(2)], the People must prove the following: [¶] Number one, the defendant *maliciously* tried to prevent or discourage [L.L.] from *cooperating* or *providing information* so the defendant *could be prosecuted*. [¶] …[¶] A person … acts maliciously when he unlawfully *intends to annoy, harm or injure* someone else *in any way* or *intends to interfere in any way with the orderly administration of justice*. It is not a defense that the

---

Similarly, 136.1(c)(3) increases the punishment for persons who knowingly and maliciously commit a 136.1 offense having been previously convicted of a prior violation of the section. The record does not reveal why the People chose not to charge this aggravated offense when Vindiola has five prior convictions for violating 136.1, all of which were directed at L.L.

[13] As noted above, the jury was unable to reach a verdict on the second 136.1(b)(2) charge in count 6, and it was eventually dismissed. It was based on the September 4, 2020, call Vindiola made to L.L., trying to get her to "talk to" B.M.

defendant was not successful in preventing or discouraging the witness or victim. It is not a defense that no one was actually injured or otherwise intimidated." (Italics added.)

Earlier in its instructions, the court told the jury that a violation of 136.1(b)(2) is a "specific intent crime[]," and "[f]or you to find a person guilty … that person must not only intentionally commit the prohibited act, but must do so with [a] specific intent. The act and the specific intent required are explained in the instructions for those crimes." (See CALCRIM No. 252.)

## C. Standard of Review

We review claims of instructional error de novo. (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.) In so doing, we "review[] the wording of a jury instruction de novo and assess[] whether the instruction accurately states the law." (*Ibid.*) We view the challenged instruction " 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*Ibid.*)

## D. The Elements of the Offense: CALCRIM No. 2622

CALCRIM No. 2622, the standard instruction for violations of 136.1,[14] establishes three elements for violations of 136.1(a) and (b).[15] "The court has a sua sponte duty to give this instruction defining the elements of [these] crime[s]." (Judicial Council of Cal., Criminal Jury Instns. (2d. Ed. 2021) Bench Notes to CALCRIM No. 2622 (Bench Notes).) However, like the offenses themselves, these elements are not identical.

---

[14] "The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050(a).) The CALCRIMs are such instructions. (*People v. Lucas* (2014) 60 Cal.4th 153, 294, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19.)

[15] CALCRIM No. 2623 is to be given in addition to 2622 when 136.1(c) offenses are charged. (Bench Notes to CALCRIM No. 2622.)

### i. Element 1:  Dissuading from Doing What?

CALCRIM No. 2622's first element has four alternatives — 1A, 1B, 1C, and 1D — depending on the defendant's motivations for the dissuading conduct: "Alternative 1A — attending or giving testimony;" "Alternative 1B — report of victimization;" "Alternative 1C — causing prosecution;" and "Alternative 1D — causing arrest."  (CALCRIM No. 2622.)

Here the trial court used the first part of alternative 1A and the second part of alternative 1C, and told the jury that to find element "[n]umber one"[16] of the 136.1(b)(2) offenses charged in counts 5 and 6, they had to find "the defendant *maliciously* tried to prevent or discourage [L.L. and B.M.] from cooperating or providing information so that the defendant could be prosecuted,"  and, also from 1A, that "[a] person … acts maliciously when he unlawfully *intends* to annoy, harm or injure someone else in any way or *intends* to interfere in any way with the orderly administration of justice."  (Italics added.)

However, as discussed, malice is not part of the underlying mens rea for violations of 136.1(b).  "[T]he language of the statute is clear and unambiguous.  [136.1] expressly sets forth a malice element as part of a [136.1(a)] violation and as part of a [136.1(c)] violation, but the plain language of subdivision (b) contains no malice element." (*Brackins, supra,* 37 Cal.App.5th at p. 66; *Cook, supra,* 59 Cal.App.5th at p. 591 [for a 136.1(b) violation, prosecutor "was not required to prove [defendant] acted knowingly and maliciously"]; cf. *People v. Serrano* (2022) 77 Cal.App.5th 902, 912 (*Serrano*) ["Malice is a separate element that must be proven to obtain a conviction" under 136.1(c)(1)].)

---

[16] Although the instruction referred to element "[n]umber one," and as we discuss below, there were no references to elements "number two" or "number three" in the instruction because they were not given.

As a result, for "element 1, alternative 1A applies to charges under [136.1(a)], which prohibits 'knowingly and maliciously' preventing or attempting to prevent a witness or victim from giving testimony." (Bench Notes to CALCRIM No. 2622.) Neither the trial court nor either counsel seemed to have realized a problem with including a portion of the inapplicable instruction for 136.1(a) charges and using it in a 136.1(b) prosecution.[17] A related problem also arises because Alternative 1A only applies to dissuading a witness or victim from attending or giving *testimony*, whereas the court told the jury it applied to dissuading L.L. and B.M. from "*cooperating* or *providing information.*"

Instead of Alternative 1A, "Alternatives 1B through 1D apply to charges under [136.1(b)]." (Bench Notes to CALCRIM No. 2622.) Indeed, "Alternative 1C—causing prosecution" should have been used here because Vindiola was charged under 136.1(b)(2), i.e., with "unlawfully attempt[ing] to prevent and dissuade [L.L], a victim and witness of a crime from *causing* a complaint, indictment, information, probation and

___

**17** It may be possible the court was using an outdated version of CALCRIM No. 2622, which originally gave trial courts discretion to include malice in an instruction for 136.1(b) offenses. A Bench Note in the earlier version had commented that an "argument can be made that the knowledge and malice requirements apply to all violations of Penal Code section 136.1(b), not just those charged with the additional sentencing factors under subdivision (c)." (Bench Notes to CALCRIM No. 2622.) As discussed, however, case law from as early as 2019 has held that malice is not an element of 136.1(b), so "[t]he current version of the instruction omits the malice element as well as the above quoted bench note." (*Cook, supra,* 59 Cal.App.5th at p. 591, fn. 3.) The current Bench Notes also cite *Brackins, supra,* to say that malice is not required for violations of 136.1(b). Here, the record does not reflect the version of CALCRIM No. 2622 the court was using, but we note that the instruction was revised in September 2020 and the trial here occurred in May 2021.

16.

parole violation to be sought and prosecuted and *assisting* in the *prosecution* thereof."[18] (Italics added.)

However, for reasons not disclosed in the record, the trial court used the language "cooperating or providing information so that the defendant could be prosecuted" in its instruction on element 1. Although this language does not appear in the statute or in Alternative 1A — nor do the terms "cooperating" or "providing information" — those two terms do appear in Alternative 1C.

Even so, the court omitted the crucial remaining part of 1C's language — "so that a [*charging document*] could be sought and prosecuted, and from helping to prosecute that *action*" — and replaced it with language not found in *any* of the Alternatives: "so that the *defendant* could be prosecuted." (Italics added.) The jury's focus therefore was directed away from the filing of charges and prosecution of the matter, as 136.1(b)(2) proscribes, to the defendant instead.

Finally, to complicate matters even more, the modified instruction on element 1 told the jury that a 136.1(b)(2) offense included dissuasion attempts that were intended to "annoy, harm or injure someone else in any way" or to "interfere in any way with the orderly administration of justice," once again using language improperly extracted from the definition of "maliciously" found in Alternative 1A and inapplicable to 136.1(b) prosecutions.

Thus, as given, element 1 of the modified instruction not only conflated 136.1(a) and 136.1(b) regarding malice, it also misinstructed on what it was that the defendant was attempting to dissuade the victim or witness from doing under 136.1(b)(2), while also borrowing additional inapplicable intent language taken from the instruction meant only for 136.1(a) and 136.1(c) offenses.

---

[18] "Alternative 1B–report of victimization" is the instruction designed for use in 136.1(b)(1) charges, and "Alternative 1D–causing arrest," is to be used for violations of 136.1(b)(3). (Bench Notes to CALCRIM No. 2622.)

At the jury instruction conference, although without specifying exactly what, defense counsel suggested language from Alternative 1C should perhaps be included. The trial court initially agreed, but it still wanted to retain the malice language. After the prosecutor started to waffle, the trial court returned to its earlier inclination, and said, "You know what, I'm going to leave it how I had it because who cares? We don't need that other language…. [T]he whole thing is to prevent … from helping to prosecute the defendant, that's the bottom line. Provide information."

However, mixing parts of the instruction applicable to 136.1(a) offenses with parts applicable to 136.1(b) offenses, thereby creating a hybrid alternative crime not found in the statute itself, and additionally omitting the portion of Alternative 1C's language that *was required* for 136.1(b)(2)'s first element, was incorrect. The modified first element of CALCRIM No. 2622 given here essentially told the jury how to convict Vindiola of a non-existent offense. This was not the only problem with the instruction.

### ii. Element 2: Dissuading Whom?

To satisfy the second element of a 136.1 offense, CALCRIM No. 2622 requires the jury must be told that the People were required to prove that the "name/description of person defendant allegedly sought to influence" — L.L. in count 5 and B.M. in count 6 — "was a (witness/[or] crime victim)." Although in hindsight the evidence and arguments here were clear that L.L. and B.M. were indeed the persons in question, the jury was not told they had to find the People had proved they were. While it is obvious in the context of this case, it still remains that the jury was not instructed on this second element.

### iii. Element 3: With What Mental State?

Immediately following element 2 in CALCRIM No. 2622 — and prefaced with the attention-getting capitalized word "AND" — element 3 requires that the People "must prove" Vindiola "*knew* [he] was (trying to (prevent/ [or] discourage)/(preventing/[or] discouraging))" L.L. and B.M. from whatever conduct was applicable under element 1's

Alternatives 1A through 1D, *and* that he specifically "*intended to do so.*" (CALCRIM No. 2622, element "3," italics added.) Thus, an element 3 should have been given to the jury to the effect that: "The defendant knew he was trying to prevent or discourage [L.L. in count 5 and B.M. in count 6] from cooperating or providing information so that [a charging document] could be sought and prosecuted, and from helping to prosecute that action[,] and [he] intended to do so." (CALCRIM No. 2622.) Once more, however, the jury was given *no* instruction on this third element.

A conviction under 136.1(b)(2) requires proof of a specific intent. (*Velazquez, supra*, 201 Cal.App.4th at pp. 229–230.) To further emphasize the need for fully instructing on element 3, in a bench note regarding a trial court's "instructional duty," we find the comment that because section 136.1 "*always* requires specific intent, the committee has included the knowledge requirement with the *specific intent requirement* in element 3," (italics added), citing *People v. Ford* (1983) 145 Cal.App.3d 985, 990 [failure to instruct on specific intent in a 136.1(c) case was reversible error] and *People v. Womack* (1995) 40 Cal.App.4th 926, 929-930. (See Bench Notes to CALCRIM No. 2622.)

Furthermore, the jury was never instructed with the specific intent element of a section 136.1(b)(2) offense despite CALCRIM No. 252's earlier promise that "[t]he act and the specific intent required [for counts 5 and 6] are explained in the instructions for those crimes." Instead of element 3, the only instruction given to the jury on Vindiola's requisite mens rea was improperly imported from Alternative 1A's definition of malice, which is to be used only when the underlying charge is a violation of 136.1(a).

More troublesome, that definition also incorrectly told the jury they had to find that Vindiola intended to "annoy, harm or injure someone else in any way" or to "interfere in any way with the orderly administration of justice," once again using language improperly extracted from the definition of "maliciously" that is inapplicable to 136.1(b) offenses. Moreover, the actual specific intent element of a 136.1(a) offense —

19.

an intent to prevent attendance or giving testimony — also fell by the wayside in the hybrid instruction that was given.

Put differently, not only was the jury not given the proper instruction for the specific intent element of a 136(b)(2) offense, they instead were given a definition of an inapplicable mental state — malice — that itself pointed to even more inapt specific intent language. As a result, like the erroneous first element, the men rea instruction for element 3 was also for a non-existent offense.

### E. Instructional Error

To summarize: Of the three elements that must be proven for a jury to convict on a 136.1(b)(2) charge, the jury here was given an incorrect instruction on the first element and no instruction on the second. As for the third element, depending on how one views it, there was either none given, or it was a specific intent instruction taken from an inapplicable definition of malice and made applicable to a non-existent crime.

"Not instructing on the[] elements … is constitutional error." (*People v. Merritt* (2017) 2 Cal.5th 819, 824 (*Merritt*).) "It is, indeed, very serious constitutional error because it threatens the right to a jury trial that both the United States and California Constitutions guarantee. [Citations.] All criminal defendants have the right to 'a jury determination that the defendant is guilty of *every element* of the crime with which he is charged, beyond a reasonable doubt.' " (*Ibid.*, italics added.)

We emphasize that not only were elements 2 and 3 of a 136.1(b)(2) violation omitted here, but the jury was also misinstructed with an incorrect version of element 1, aggravating the problem and distinguishing this case from those where the analysis was solely focused on partially missing elements or definitions. In other words, this is a case where *none* of the elements of the offense — or of *any* offense for that matter — was given to the jury.

As such, the question is not merely "what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon

the guilty verdict in the case at hand." (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279 [defective reasonable doubt instruction reversible per se].) "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error. That must be so, because to hypothesize a guilty verdict that was *never in fact rendered* — no matter how inescapable the findings to support that verdict might be — would violate the jury-trial guarantee." (*Ibid.*, second italics added.)

We therefore turn to whether the instructional errors in this case were harmless. (*Serrano, supra,* 77 Cal.App.5th at p. 913.)

### F. Harmless Error

" ' "[T]he omission of one or more elements of a charged offense … is amenable to review for harmless error under the state and federal Constitutions…." [Citation.] "A trial court's failure to instruct the jury on all of the essential elements of the charged offense is reviewed for harmless error according to the standard set out in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*)." [Citation.] Under the *Chapman* standard, an error is prejudicial and requires reversal of the conviction unless it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." [Citation.] Accordingly, the error " 'will be deemed harmless *only in unusual circumstances*, such as where each element was undisputed, the defense was not prevented from contesting any [or all] of the omitted elements, and overwhelming evidence supports the omitted element.' " ' " (*Serrano, supra,* 77 Cal.App.5th at pp. 913–914, italics added; see *People v. Aledamat* (2019) 8 Cal.5th 1, 9 [the *Chapman* "harmless error rule applies in a variety of contexts, such as to error in omitting entirely one or more elements of a charged offense"].)

"The [*Chapman*] test is not whether a hypothetical jury, no matter how reasonable or rational, would render the same verdict in the absence of the error, but whether there is

any reasonable possibility that the error might have contributed to the conviction in this case. If such a possibility exists, reversal is required." (*People v. Lewis* (2006) 139 Cal.App.4th 874, 878; *People v. Atkins* (2019) 31 Cal.App.5th 963, 981 ["For this type of error, 'the presumption is that we must reverse, unless we find the error harmless beyond a reasonable doubt.' "].)

When a trial court does not fully instruct a jury on every element of a charged offense, " '[t]he critical inquiry … is not the *number* of omitted elements but the *nature* of the issues removed from the jury's consideration.' " (*Merritt, supra,* 2 Cal.5th at p. 828.) Even so, "the more elements that are omitted, the less likely it is that the error is harmless, but so long as the error does not vitiate *all* of the jury's findings, it is amenable to harmless error analysis." (*Id.* at p. 829.) Thus, we must determine whether this is one of *Serrano*'s "unusual circumstances." (*Serrano, supra,* 77 Cal.App.5th at p. 913.)[19]

In *Serrano,* a different panel of this court found instructional error harmless in a 136.1(c) case where, somewhat ironically here, the trial court failed to instruct on malice. (*Serrano, supra,* 77 Cal.App.5th at pp. 911, 917.) After reviewing several cases where other courts both did and did not find instructional error harmless in 136.1 cases, we concluded omitting the definition of malice in that case was harmless because "there is no evidence in the record that could rationally lead a jury to find that defendant's conduct was *not* intended to annoy, harm, or injure [the victim]. Defendant's act of pushing [the

---

[19] We may quickly dispense with the trial court's failure to instruct on element 2. There was no question that L.L. was the person upon whom Vindiola was focusing his dissuasion attempts in count 5, and there is no doubt the failure to instruct on this element affected the conviction in this case or that the jury would still have convicted on this count had they been instructed that they had to find beyond a reasonable doubt that count 5 referred to L.L. The lack of an instruction on element 2 was therefore error but, under the circumstances, it was harmless beyond a reasonable doubt. (See *People v. Pettie* (2017) 16 Cal.App.5th 23, 69, fn. 15 (*Pettie*) [failure to instruct on element 2 in 136.1(c) case was "harmless beyond a reasonable doubt, as the evidence on this point was undisputed"].)

22.

victim] to the ground and putting his foot on her face was clearly intended to annoy, harm, or injure her." (*Id.* at p. 917.) In other words, his conduct was clearly malicious. Different from the current case, however, in *Serrano* the jury was fully and correctly instructed on all the other elements of the offense, including the required specific intent and the nature of the dissuasion, and the jury's verdict on other counts left no doubt all those elements had been met. (*Ibid.*)

Also distinguishable is *Merritt, supra,* where the Supreme Court found a failure to instruct on multiple elements was harmless. In *Merritt*, the court found the trial court's failure to instruct the jury with the elements of two charged robberies harmless due to the strength of the evidence and the underlying defense theory of the case. (*Merritt, supra*, 2 Cal.5th at pp. 831–833.) The defendant had been charged with robbing two different clerks on two different occasions, and both crimes had been caught on surveillance cameras. (*Id.* at pp. 822–824.) At trial, the defense conceded there was "no question [the victims] were robbed," but argued the defendant had been wrongly identified as the perpetrator from the surveillance videos. (*Id.* at p. 824.) The only real issue at trial was the identity of the robber and there was no dispute the crimes that had been committed satisfied the elements of robbery. Based on this concession and the fact the crimes were recorded, the court concluded it was impossible the jury would have acquitted the defendant of robbery had they been instructed on the elements of that offense. In addition, having decided the identity issue against the defendant on a properly instructed firearm-use enhancement, the court also found it was a foregone conclusion the jury would have found the elements of robbery had been satisfied if instructed. (*Id.* at pp. 831–833.) Conversely, here identity was not at issue and the defense conceded none

23.

of the elements of the offenses in counts 5 and 6, so much so that the jury could not reach a verdict on count 6.[20]

Moreover, contributing to the harmless error finding in *Merritt,* the court emphasized that the "jury was not entirely ignorant of the elements of robbery. Although the court did not instruct on the elements (*except the mental state*), attorneys for both parties accurately described the elements of robbery in front of the jury." (*Merritt, supra,* 2 Cal.5th at p. 831, italics added.) Here, in contrast, the trial attorneys' closing arguments not only did not cure the lack of a correct jury instruction on the elements of the offense, they exacerbated it.

In his closing arguments, the prosecutor also conflated 136.1(a)'s malice with 136.1(b)'s specific intent requirement: "What's [Vindiola's] intent by [placing the calls]? His intent is to prevent or discourage from cooperating. He intended to *interfere with the*

---

[20] The jury could not reach a verdict on the count involving dissuasion of B.M. even though it was misinstructed identically. During deliberations, the jury sent out a note stating they were "struggling with one count" and asked for "a better definition of dissuade." The trial court indicated it would reread its modified CALCRIM No. 2622 to them as well as CALCRIM No. 3551,which covered deliberations and what to do if the jury cannot reach a verdict.

With the jury back in the box, the court re-read its modified instruction. It added, "[T]he instruction defines dissuading in the context of the instruction itself, which is to prevent or discourage, and it is repeated here where it says, 'It is not a defense that the defendant was not successful in preventing or discouraging.' So you can place dissuading into this section here, preventing or discouraging, and they're synonymous."

After an hour of further deliberations, the jury told the court they still were not able to reach a verdict on the count involving B.M. They were numerically split 10-2 on the count, although the record does not reflect how.

At a minimum, this suggests that the jury was unclear about "dissuasion," one of the terms used in the faulty instruction they were given. It may also indicate they were unable to ultimately reach agreement as to just what Vindiola was intending to get L.L. to do regarding B.M. — it was ambiguous — which in turn may or may not be due to the way they were misinstructed. Either way, we cannot confidently say beyond a reasonable doubt that the misinstruction did not contribute to the lack of a verdict on this count.

*orderly administration of justice*." (Italics added.) Again, in his rebuttal, the prosecutor stated Vindiola's "intent was to try and [*sic*] prevent and dissuade [L.L.] to *interfere with the orderly administration of justice*," and "I'll submit to you, *his intent is to interfere in* [sic] *the orderly administration of justice*." (Italics added.) However, as we have seen, that is not the requisite intent element for a 136.1(b)(2) offense. As discussed, the phrase "orderly administration of justice" was in the trial court's definition of malice used in the court's misstatement of *element 1,* which compounded the error because malice is part of the mens rea of a 136.1(a) or 136.1(c) offense, but not 136.1(b)(2).[21]

Defense counsel's closing argument was equally misdirected: "[P]ay close attention to the term *maliciously* and also, I think more importantly, intent when it comes to what that *malicious term is defined as*…. "[Y]ou're being tasked to … determine what was going on in [Vindiola's] head during these calls and whether or not that was his intent to dissuade [L.L. and B.M.]." (Italics added.) Once again, "malice" was borrowed from subdivision (a) and mixed in with Vindiola's specific intent to dissuade L.L. and B.M. from cooperating with the prosecution, which *is* a part of 136.1(b)(2). Simply put, neither party "accurately described the elements" of 136.1(b)(2) in front of the jury. (*Merritt, supra*, 2 Cal.5th at p. 831.)

Another " 'situation in which instructional error removing an element of the crime from the jury's consideration has been deemed harmless is where the defendant concedes or admits the element.' " (*Merritt, supra,* 2 Cal.5th at p. 831; see also *People v. Mil* (2012) 53 Cal.4th 400, 411 ["[w]here an instruction omits some elements of the offense or allegation, but the elements were uncontested and supported by overwhelming

---

[21] See *People v. Canizales* (2019) 7 Cal.5th 591, 616–617 (*Canizales*) [When "taken together," the "potential for confusion created by [the improper] instruction in combination with the prosecutor's argument," supported a finding of prejudice]; cf. *In re Loza* (2018) 27 Cal.App.5th 797, 805 ["Under *Chapman*, we also take particular note of a prosecutor's closing arguments."].)

evidence, it would not necessarily follow that the trial was fundamentally unfair or an unreliable vehicle for determining guilt or innocence"]; *Connecticut v. Johnson* (1983) 460 U.S. 73, 87 (plur. opn. of Blackmun, J.) ["error may be harmless if the defendant conceded the issue of intent" in cases such as "alibi, insanity, or self-defense"].)

Again, however, that is not the case here. Defense counsel specifically focused on Vindiola's intent in his arguments. Indeed, intent was really his only defense to this charge because Vindiola's dissuasion attempts aimed at L.L. were on tape.

Thus, defense counsel's focus in his closing argument pointed directly to Vindiola's intent: "[Y]ou're being tasked to … determine what was going on in [Vindiola's] head during these calls and whether or not that was his intent to dissuade [L.L. and B.M.]." Counsel even argued Vindiola's actual intent was to get L.L. to bail him out so he could then jump bail and flee, but not to prevent L.L. from "coming in to cooperate with prosecution."

That is the core problem here: the jury was never correctly told what specific intent they needed to find in order to convict on this charge. Even assuming the definition of malice in element 1 could somehow be stretched into an instruction on specific intent, it was inconsistent with what element 3 actually required for a conviction on a 136(b)(2) offense — or a 136(a) offense for that matter — and instead told the jury they only needed to find Vindiola "unlawfully intend[ed] to annoy, harm or injure someone else *in any way* or intend[ed] to interfere *in any way* with the orderly administration of justice." (Italics added.)

In fact, "interfer[ing] in any way with the orderly administration of justice" is so sweepingly general that it would swallow up *all* 136.1 offenses in its scope and render element 3 superfluous. That, however, is not how the Legislature has chosen to define witness dissuasion offenses. The trial court's comment about how its truncated version of CALCRIM No. 2622 instruction was "better" may or may not be true, but it is not how

the Legislature has categorized its varieties of the 136.1 offense and it is that body that defines crimes.

The modified instruction did not require the jury to find beyond a reasonable doubt that Vindiola intended to prevent or dissuade L.L. from "causing a complaint, indictment, information, probation or parole violation to be sought and prosecuted, and assisting in the prosecution thereof," the crime with which he was charged. Instead, from the way the jury was instructed in this case, all we can confidently say is that the jury found Vindiola "maliciously tried to prevent or discourage [L.L.] from cooperating or providing information so that [he] could be prosecuted," and did so with an intent "to annoy, harm or injure someone else in any way" or "to interfere in any way with the orderly administration of justice." That, however, does not describe a violation of 136.1(b)(2), and misinstruction aside, "the evidence of [Vindiola's] intent does not compel a contrary finding beyond a reasonable doubt." (*Pettie, supra,* 16 Cal.App.5th at p. 71 [failure to instruct on specific intent in 136.1(c)(1) case was not harmless error].)

Similarly, unlike in *Merritt*, the evidence supporting the omitted elements here was not overwhelming, nor did defense counsel stipulate the evidence satisfied the omitted elements. Rather, the prosecutor and defense counsel disagreed as to the meaning of Vindiola's demands made to L.L.[22]

We find this case is more akin to *Hallock, supra,* where we reversed a 136.1(c)(1) conviction when the jury was wrongly instructed on an uncharged violation of 136.1(a). (*Hallock, supra,* 208 Cal.App.3d at p. 605-606, 607.) In that case, the defendant attempted to rape a woman and then threatened to blow up her house if she reported the

---

[22] Aware he was being recorded, and perhaps remembering his prior 136.1 convictions, Vindiola avoided telling L.L. exactly what he wanted her to do even when she asked. He did tell her to evade subpoena service, but if that was intended for her to avoid appearing and testifying (violating 136.1(a)) or to not cooperate with the prosecution (violating 136.1(b)(2)) is not clear, let alone supported by overwhelming evidence.

crime. The defendant was charged with attempting to dissuade a witness from *reporting* a crime by means of force or threat under 136.1(c)(1), which is the aggravated expansion of 136.1(b)(1) when accompanied by threats or force. However, the trial court erroneously instructed the jury on the elements necessary to prove an attempt to dissuade a witness from *testifying* at a legal proceeding, an offense which arises instead under 136.1(a)(1). (*Hallock, supra*, 208 Cal.App.3d at p. 607.)

"[O]n the question of whether giving the wrong instruction was prejudicial," we emphasized that "there was absolutely no instruction regarding the specific witness intimidation offense actually charged and upon which defendant was convicted. Therefore, we need not speculate on the probability of whether defendant was convicted on an unsupportable theory. It is clear that he was." (*Hallock, supra*, 208 Cal.App.3d at p. 609.) Consequently, we found "the various instructional errors, in combination if not singly, were prejudicial with regard to" the 136.1(c)(1) conviction. (*Id.* at p. 610.)

Thus, in *Hallock* the conviction was reversed where the defendant "was charged pursuant to subdivision (b) but the jury was instructed on a violation of subdivision (a)," i.e., the jury was instructed on the *wrong* offense. (*Id.,* 208 Cal.App.3d at p. 607.) Here, Vindiola was also charged pursuant to subdivision (b), but the jury was instructed on a *non-existent* version of 136.1. The result is the same.

As instructed with the modified version of CALCRIM No. 2622, and as both counsel argued in their closing statements, the jury could reasonably have concluded the evidence supported a 136.1(b)(2) conviction based on a mélange of 136.1(a) and 136.1(b), whereby Vindiola attempted to "prevent[] or discourage[] [L.L.] from cooperating or providing information so that [Vindiola] could be prosecuted," with the malicious intent "to annoy, harm or injure someone else in any way" or "to interfere in any way with the orderly administration of justice." (See *Canizales, supra,* 7 Cal.5th at p. 614 [instructional error plus prosecutor's argument "could reasonably have led the jury to believe it could" convict on a "legally inaccurate" theory].)

28.

We find the instructional errors regarding elements 1 and 3 were prejudicial in this instance because "it is not clear beyond a reasonable doubt that a reasonable jury would have returned the same verdict absent the error" (*Canizales, supra,* 7 Cal.5th at p. 618), nor that the multiple instructional errors in this case "did not contribute to the verdict." (*People v. Chun* (2009) 45 Cal.4th 1172, 1201.) Vindiola's conviction on count 5 is therefore reversed.

The People may elect to retry Vindiola on that charge, although with a properly instructed jury. (*Hallock, supra,* 208 Cal.App.3d at p. 607 ["If reversal is predicated on instructional error, … double jeopardy principles do not come into play".]; see *Burks v. United States* (1978) 437 U.S. 1, 14–15 [reversal for trial error, as distinguished from evidentiary insufficiency, does not trigger double jeopardy concerns]; accord *Tibbs v. Florida* (1982) 457 U.S. 31, 39–41.)

## II. Sentencing Errors

Vindiola raises four sentencing error claims, the first three of which the People concede:

 (1) Remand for resentencing is required because of retroactive changes made to section 1170 after Vindiola was originally sentenced; (2) The trial court imposed an unlawful concurrent 15-year determinate sentence in the probation case; and (3) The abstract of judgment must be corrected to include his presentence custody credits. As for Vindiola's fourth contention, that the trial court abused its discretion by failing to "strike at least some of his prior 'strikes' to prevent a life sentence" (bold and capitalization omitted), the People disagree.

Because we are reversing the 136.1(b)(2) witness dissuasion conviction, the consecutive indeterminate 25-years-to-life sentence on that count must also be vacated. Moreover, we agree that resentencing on the determinate counts is also necessary because of the changes made to section 1170. Similarly, the 15-year sentence imposed on Vindiola's probation case was unlawful and cannot be reimposed on remand; instead,

29.

only the previously stayed nine-year sentence can be executed and imposed. Finally, the abstracts of judgment on both cases must also include Vindiola's presentence custody credits.

Since we are remanding for a full resentencing hearing, we need not address Vindiola's claim regarding the trial court's decision not to strike at least five of Vindiola's six strike priors and thereby impose a determinate aggregate sentence. Instead, Vindiola may renew his request to strike strikes at the resentencing hearing. For guidance at resentencing, we provide a brief discussion.

## A. Section 1170 and Vindiola's 13-Year Determinate Sentence

The trial court imposed a mid-term sentence of four years for the great bodily injury enhancement, and a consecutive two-year mid-term sentence (doubled to four years based on a strike prior) for the false imprisonment conviction in count 3.[23] With the five-year term for the serious felony prior under section 667, subdivision (a), Vindiola received a 13-year determinate sentence to be served consecutive to his two 25-to-life indeterminate terms.[24]

---

[23] The record is incomplete in this regard because the abstracts of judgment are fragmentary, and we have had to cobble together Vindiola's final sentence – both on his current case and his probation violation case – from the reporter's transcript and a partial clerk's transcript. We only have a part of the indeterminate abstract of judgment on the current case, no determinate abstract of judgment, and no abstract of judgment from the probation case. Inexplicably, the portion of the indeterminate abstract of judgment we do have shows on line 6b that the trial court imposed a 25-years-to-life sentence on count 3, not a determinate sentence, whereas line 1 on the same page makes no reference to count 3 at all.

[24] Three bills amending section 1170 were enacted and signed into law on the same date during the 2021–2022 Regular Session: Senate Bill No. 567 (SB 567) (Stats. 2021, ch. 731, § 1.3); Assembly Bill No. 124 (AB 124) (Stats. 2021, ch. 695, § 5); and Assembly Bill No. 1540 (AB 1540) (Stats. 2021, ch. 719, § 2). SB 567 takes precedence over the other two because it bears the highest chapter number and was enacted last. (Gov. Code, § 9605, subd. (b); *In re Thierry S.* (1977) 19 Cal.3d 727, 738–739.) SB 567 states that if all three bills amending section 1170 are enacted and become effective on or

SB 567 amended section 1170 and, among other things, created a presumption in favor of a *low*-term sentence in certain circumstances. (Stats. 2021, ch. 731, § 1.3, adding § 1170, subd. (b)(1), (b)(2), and (b)(6).) Specifically, section 1170, subdivision (b)(6) now provides: "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice, the court *shall* order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. [¶] (B) The person is a youth, or was a youth … at the time of the commission of the offense…." (§ 1170, subd. (b)(6), italics added.) A "youth" for purposes of this section "includes any person under 26 years of age on the date the offense was committed." (§ 1016.7, subd. (b).)

The People correctly concede that the new section 1170, subdivision (b) applies retroactively to this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Flores* (2022) 75 Cal.App.5th 495, 500 (*Flores*) [SB 567]; *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1095 [AB 124]; accord *People v. Banner* (2022) 77 Cal.App.5th 226, 240 (*Banner*) [AB 124]; see *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308 [the "*Estrada*[25] rule"].)

Undisputedly, Vindiola was 19-years old when he committed his crimes and therefore section 1170, subdivision (b)(6)(B) potentially applies. Similarly, the record suggests Vindiola may have experienced psychological and physical childhood trauma, including being raised in a household of violence and the murder of his mother by his

before January 1, 2022, and SB 567 is enacted last, then section 1.3 of that bill, which incorporates the amendments proposed by all three bills, shall become the operative law. (Stats. 2021, ch. 731, § 3.)

[25] *People v. Estrada* (1965) 63 Cal.2d 740.)

stepfather, which was followed by his stepfather's suicide during a police stand-off. Section 1170, subdivision (b)(6)(A) may therefore also be implicated.

Accordingly, under section 1170, subdivision (b)(6), the two mid-term portions of Vindiola's 13-year determinate sentence must be vacated and reconsidered. However, we emphasize that section 1170, subdivision (b)(6)(A) and (B) do not *require* imposition of the lower term in every case in which the defendant was under age 26 at the time the crime was committed or experienced childhood trauma. Rather, these provisions establish a *presumption* in favor of the lower term if the defendant's youth or childhood trauma were "a contributing factor" in the commission of the crimes committed "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances [such] that imposition of the lower term would be contrary to the interests of justice.…" (§ 1170, subd. (b)(6)(B).)

On remand the trial court must consider these new provisions when imposing any determinate sentence. (See *Flores, supra,* 73 Cal.App.5th at p. 1039.) Both parties may present arguments and evidence pertaining to the changes made by SB 567, or any other applicable sentencing laws, to the trial court in the first instance. (*People v. Lewis* (2022) 86 Cal.App.5th 34, 36.)

**B.  The Sentence in the Probation Case**

Initially, we point out Vindiola's trial attorney did not file a notice of appeal from the judgment and sentence imposed in the probation case. Similarly, his appellate counsel has not filed a motion for constructive notice of appeal, moved to include the judgment in that case in the current appeal, or even filed a request that the record be augmented to include the portions of the record in that case that are relevant to our consideration of the issues appellate counsel now raises on appeal. As a result, we have no abstract of judgment from which to confirm the sentence imposed or the presentence

credits awarded in the probation violation case, and we are limited to the trial court's oral recitation found in the reporter's transcript of the current case.[26]

Moreover, although the incomplete abstract of judgment we have for the current case references the probation case, it does not include a complete description of just how the 15-year sentence was calculated, what credits were awarded, if any, or what was ultimately sent to the Department of Corrections and Rehabilitation. The probation officer's report in the current case does include the original probation report from the probation case, but it only tells us what the probation officer believed to be the possible sentencing alternatives available to the trial court, not what the trial court ultimately did.

Vindiola's appellate counsel contends that "[a] notice of appeal shall be 'liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced.' " Counsel's citation to *People v. Mitchell* (2001) 26 Cal.4th 181, 188, for the proposition that where an "evident discrepancy [exists] between the abstract of judgment and the judgment that the reporter's transcript and the trial court's minute order reflect, the appellate court … should order the trial court to correct the abstract of judgment," is inapt because we neither have an abstract of judgment for the probation case, nor a minute order chronicling what happened in that case on the day of sentencing; we have only a reporter's transcript so there is no "evident discrepancy." The other authority counsel cites in support is also off-point because none involved construing an appeal from a judgment in one case as including the judgment in a separate case from which no appeal was taken. Similarly, although the People have no objection to our

---

[26] People's trial exhibit 47, admitted at trial and obtained by appellate counsel's February 16, 2022, record correction request, is a minute order from the probation case dated October 29, 2019. It appears to show the original imposition of a stayed nine-year prison term but when examined closer it only seems to add up to *seven* years. We have no reporter's transcript from that hearing to explain this inconsistency.

"liberally construing" Vindiola's notice of appeal to be one taken from the judgment in both cases, they too cite an inapposite case in support.

It is not our responsibility to ensure we have the necessary and complete appellate record from which to assess an appellant's claims, and it is not the superior court's duty to prepare and provide an appellate record over and above the normal appellate record — which does not include court records in related cases that have not been appealed — except upon an appellant's specific request or an order from this court.[27]

Nevertheless, we somewhat reluctantly accept the People's acquiescence. The People will not be prejudiced by our consideration of the judgment in the probation case, the sentence imposed on that case was undisputedly unlawful and may be corrected at any time, and, in any event, we are remanding this matter to the trial court for a full resentencing hearing.

As best we can determine about the probation case, in 2019 Vindiola pistol-whipped L.L. with a firearm, which resulted in a section 273.5, subdivision (a), conviction with a section 12022.5, subdivision (a) use-enhancement. He was also convicted of five counts of violating 136.1 for his attempts to dissuade L.L. from cooperating with police, assisting in the prosecution of his felonious assault on her, and testifying against him. The trial court imposed a nine-year prison sentence in that case but stayed execution of the sentence and instead placed Vindiola on a grant of probation. In 2021, at the sentencing hearing for the current case, the trial court revoked Vindiola's probation from the 2019 convictions and imposed a 15-year determinate sentence to run concurrent to the aggregate 63 years to life in the current case.

---

[27] " 'When practicing appellate law, there are at least three immutable rules: first, take great care to prepare a complete record; second, if it is not in the record, it did not happen; and third, when in doubt, refer back to rules one and two.' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609, fn. 11.)

"[W]hen … a lawful sentence is imposed but execution thereof is suspended and the defendant is placed on probation, *the exact sentence* must be ordered executed if probation is subsequently revoked.  A trial court is without jurisdiction to do anything else…." (*People v. Martinez* (2015) 240 Cal.App.4th 1006, 1017, original italics; *People v. Howard* (1997) 16 Cal.4th 1081, 1088, 1094 [cannot impose a lesser sentence either]; *People v. McKenzie* (2018) 25 Cal.App.5th 1207, 1214 [must impose the "exact sentence"]; see § 1203.2, subd. (c).)

Thus, the court imposed an unlawful 15-year sentence and only the stayed nine-year term from that case can be imposed.  This requires a resentencing on the probation violation case and amended abstracts of judgment in both cases.

**C.  The Indeterminate Sentence and the Strikes**

Because the judgment is being partially reversed and the indeterminate sentence on the witness dissuasion count vacated, and since we have concluded that "the need to apply amended section[] 1170, subdivision (b) … creates sufficiently ' "changed circumstances" ' [citation] to warrant a full resentencing" in this matter (*People v. Jones* (2022) 79 Cal.App.5th 37, 46), on remand the trial court must fully resentence Vindiola anew.  (See *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 (*Valenzuela*) ["[T]he full resentencing rule allows a court to revisit *all* prior sentencing decisions when resentencing a defendant." (Italics added.)]; accord *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["The full resentencing rule"].)  A full resentencing may involve the trial court's revisiting such decisions as the selection of a principal term, whether to stay a sentence, whether to impose an upper, middle, or lower term, including on enhancements, and whether to impose concurrent or consecutive sentences.  (*Valenzuela, supra,* 7 Cal.5th at pp. 424–425.)

Because the trial court must reevaluate its entire sentence, Vindiola may also renew his request to have the trial court revisit its determination regarding indeterminate terms and whether to strike some or all of his prior strikes.  We express no opinion how

35.

the trial court should exercise its sentencing discretion on remand. Instead, "[t]hose are questions best left to the trial court to answer in the first instance." (*Banner, supra*, 77 Cal.App.5th at p. 242.)

### D. Conduct Credits and the Abstracts of Judgment

At the conclusion of the October 12, 2021, sentencing hearing, the trial court stated Vindiola was entitled to 516 total days of presentence credits for the current case and the court docket confirms this amount. However, the partial abstract of judgment for this case, filed on October 15, 2021, does not specify any credits, and instead merely states "SEE 290." There is no "290" in the appellate record, only a "290A" form with no mention of credits, and the parties have not provided us with a "290" form. Similarly, for the probation case, the trial court stated Vindiola was entitled to 955 days of credits, but we have no corresponding minute order or abstract of judgment because, as discussed, Vindiola's attorneys did not file a notice of appeal from the judgment and sentence in that case.

On remand, the superior court must prepare accurate and complete abstracts of judgment for *both* the current case and the probation violation case, and ensure Vindiola's presentence credits are included.

### DISPOSITION

The judgment is reversed in part, affirmed in part, and remanded for further proceedings.

Vindiola's Penal Code section 136.1, subdivision (b)(2) witness dissuasion conviction in count 5 is reversed and its indeterminate sentence is vacated. The People may elect to retry Vindiola on that charge.

The 15-year concurrent determinate sentence imposed on the probation case arising out of Vindiola's 2019 conviction in Fresno County Superior Court Case number F19901922 is vacated, and the trial court is directed to instead confirm and impose the originally stayed term. The sentences on the remaining counts are also

36.

vacated, and the matter is remanded for full resentencing proceedings in a manner consistent with this opinion.

Following resentencing, the superior court clerk is directed to prepare amended abstracts of judgment in both the current case and the probation violation case, both of which must include Vindiola's pre-sentence conduct credits, and forward certified copies to the Department of Corrections and Rehabilitation and any other necessary parties.

In all other respects, the judgment is affirmed.

SNAUFFER, J.

WE CONCUR:

DETJEN, Acting P. J.

MEEHAN, J.